JUDGE McMAHON

**20 CV 6794**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------X

CCB and RB,                                                    20-CV-

                        Plaintiffs,

                                          **COMPLAINT**

      -against-

SANDRA ROSENTHAL, ELISSA GROSSINGER,
ROBERT HARRIS, JOHN OLUFEMI, NIKISHA STEELE,
ST. VINCENT'S SERVICES, INC., HEARTSHARE
ST. VINCENTS SERVICES, HEARTSHARE HUMAN
SERVICES OF NEW YORK, TRACY WELLMAN,
LOUIS MURRAY, TONI TAYLOR, CARMEN SMITH,          **PLAINTIFFS**
DEBORAH JOHNSTON, JILL CAMPBELL, JOHN,            **DEMAND TRIAL**
MATTINGLY, and CITY OF NEW YORK,                  **BY JURY**

                       Defendants.

-----------------------------------------------------------------------------X

       Plaintiffs CCB and RB, by their attorneys Bruce A. Young and Lansner &

Kubitschek, file this Complaint against the Defendants in their individual and official capacities,

and hereby respectfully shows the Court as follows:

## I. PRELIMINARY STATEMENT

      1.     This is a civil rights action in which plaintiff seeks damages to redress the

deprivation, under color of state law, of rights secured under the First, Fourth, and Fourteenth

Amendments to the United States Constitution. Plaintiffs also append state statutory and

common law claims.  Plaintiffs were foster children in the custody of Defendant City of New

York, which placed them in the care of Defendant St. Vincent's Services, Inc., which now does

business as HeartShare St. Vincent's Services, and is affiliated with HeartShare Human Services

of New York, one of Defendant City's foster care agencies, where plaintiffs suffered serious

physical injuries, including sexual abuse, and inadequate and improper medical and therapeutic

care. Plaintiffs' injuries of sexual, physical, and emotional abuse were caused by the inadequate

investigation, improper supervision, and failure by the Defendants to protect Plaintiffs from

abuse.  Defendants acted negligently, grossly negligently, recklessly, and with deliberate

indifference and gross disregard of Plaintiffs' constitutional, statutory, and common law rights.

Plaintiffs bring this action against the organizations and their employees who improperly

supervised Plaintiffs in the foster home and failed to protect plaintiffs from injury.

## II. JURISDICTION

2.     Jurisdiction is conferred on this Court by 28 U.S.C. §§1343(3) and (4),

which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C.

§1983.  Jurisdiction is also conferred on this Court by 28 U.S.C.§1331(a) because the case arises

under the Constitution and the laws of the United States.  Pursuant to 28 U.S.C. §1367, this court

has pendent jurisdiction over Plaintiffs' state law claims and over certain defendants.

## III. PARTIES

3.     Plaintiff CCB, born in 2000, resides in the County of Suffolk, New York.

On the date of the filing of this complaint, plaintiff CCB was less than 21 years old.

4.      Plaintiff RB, born in 1999, resides in the County of Suffolk, New York.

On the date of the filing of this complaint, plaintiff RB was less than 21 years old.

5.     Defendant City of New York ("City") is a municipal corporation,

incorporated pursuant to New York State law.

6.     Defendant City of New York is responsible for providing child welfare

services to children, adolescents and young adults up to age 21, including foster care, shelter,

2

medical care, supervision, and protection from abuse.

7.     Since 1949, Defendant City of New York has assumed responsibility for caring for its most vulnerable children: abused, neglected, and abandoned children, who are generally impoverished. That responsibility includes providing those vulnerable children with shelter, services, oversight, structure, education and vocational training. Defendant City of New York has chosen to contract with private agencies for much of the provision of said services. Although many of such agencies are known to be substandard, Defendant City continues to contract with the same private agencies to care for its children, ignoring the financially corrupting motivation that exists for agencies to operate foster homes solely to obtain a portion of the substantial foster care funds that the City pays them. The aforementioned policy and practice by Defendant City to use private agencies has spawned overcrowding and substandard treatment and supervision in the housing and care of foster children, which constitutes deliberate indifference to Plaintiffs' constitutional rights and their safety and welfare.

8.     Defendant City of New York, through its Administration for Children's Services ("ACS"), was  responsible for the care, control, and supervision of Plaintiffs and of the foster care agencies with which it contracts.

9.     The acts and omissions of Defendant City are carried out pursuant to the policies and customs of Defendant City and reflect its policies and practices. Plaintiffs, at all times mentioned herein, were involuntarily detained by Defendant City in its foster care and guardianship system.  Plaintiffs were involuntarily removed from their parents and made dependent upon Defendant City for their care, supervision, safety, medical and therapeutic treatment, guidance and control.

10.     Defendant St. Vincent's Services, Inc., is a not-for-profit, domestic corporation incorporated under the laws of the State of New York.

11.     Upon information and belief, in 2014, Defendant St. Vincent's Services, Inc., merged some or all of its operations with those of HeartShare Human Services of New York, and began doing business as HeartShare St. Vincent's Services.

12.     Upon information and belief, Defendant HeartShare Human Services of New York is a not-for-profit domestic corporation incorporated under the laws of the State of New York, located in Brooklyn, New York, and defendant St. Vincent's Services is an affiliate of HeartShare Human Services of New York. (Defendants St. Vincent's Services, Inc., HeartShare St. Vincent's Services, and HeartShare Human Services of New York are collectively referred to hereinafter as "SVS.")

13.     Upon information and belief, Defendants SVS have, at all times relevant, provided foster care for children who are in the legal custody of defendant City, including Plaintiffs, a function that traditionally has been performed by the government, and is required by state and federal law to be performed by the government. Defendant City has chosen to delegate part of this traditional public function to private organizations, including Defendants SVS.

14.     In 2009, the annual budget of Defendant St. Vincent's Services, Inc., was $42,405,142 of which 99% was from public funds.

15.     In accepting and assuming Defendant City's obligation, Defendants SVS act under color of state law when performing the functions involved in caring for, protecting, treating and educating the children.

16.     All actions taken by Defendants SVS to maintain and protect the children

4

in their care are actions taken under color of state law, which subject Defendants SVS and their agents and employees to liability under the provisions of 42 U.S.C. §1983, because Defendants SVS acted jointly with Defendant City, performed a government function, and were entwined with the City in the provision of foster care services to children. Among other evidence of state action are the following:

a. Under State and federal law, the government (City, County or State) has legal custody of every child who is in foster care in the United States;  *See*, N.Y. Soc. Serv. L. §§378, 395; 42 U.S.C. §§672(a)(2)(B)(i) and (ii);

b. Defendant City of New York has legal custody of each New York City child in foster care, including Plaintiffs; *Wilder v. Bernstein*, 848 F.2d. 1338, 1341 (2d Cir. 1988);

c. Outside of New York City, the 57 upstate counties have legal custody of all of the foster children in their respective counties;

d. The City and upstate counties have the option of providing foster care services directly, *i.e.,* through public foster care agencies, or of contracting with private not-for-profit corporations to provide the day-to-day foster care of the foster children, who remain in the legal custody of the City or county government;

e. Most of the 57 upstate counties provide foster care through a public foster care agency, the county's Department of Social Services;

f. upon information and belief, the City of New York contracts with private not-for-profit foster care agencies to provide day-to-day care for most, but not all, of the City's foster children, including Plaintiffs;

g. during the time that Plaintiffs was in foster care, Defendant City had contracts with

between 20 and 35 different not-for-profit foster care agencies to provide day-to-day care for Defendant City's foster children;

h. Defendant City contracted with Defendants SVS to provide foster care to children, and, in so doing, defendant City outsourced some of its constitutional obligations to those agencies;

i. upon information and belief, the contracts between the City and all of the foster care agencies are identical, except for the number of children to be placed with each agency and the amount of money that the City pays each agency to care for the children;

j. according to the language of the foster care contract itself, the fundamental purpose of the contract between each foster care agency and the City of New York is to provide the best available services to children whom the City entrusts to the foster care agency and to ensure that the health, welfare, and fundamental rights of the children in foster care shall be the guiding principle for all decisions which affect the foster children's lives;

k. according to the contract, the foster care agency agrees to take necessary steps to ensure the provisions of services, care, treatment, and support to the foster children in its care;

l. pursuant to the contract, the City retains ultimate responsibility for the protection and preservation of the welfare of each child in the care of the contract foster care agencies, including Defendants SVS;

m. pursuant to the contract, the City has final administrative authority over all placement decisions regarding each child;

n. pursuant to the contract, the City has the ultimate authority for making all decisions relative to the welfare of such child;

o. Schedule B to the contract provides that the City has final decision-making authority

over the following issues regarding each foster child, although the foster care agency must make

written proposals on each of those topics:

> -initial risk assessment and service plan,
>
> -comprehensive risk assessment and service plan,
>
> -subsequent six-month risk assessment and service plans,
>
> -trial discharge of a child from foster care to his parents or relatives,
>
> -final discharge of a child from foster care to his parents or relatives,
>
> -transfer of a child to a higher level of care or another foster care agency,
>
> -starting and ending preventive services to the family,
>
> -starting, modifying, and ending homemaker services,
>
> -providing day care services,
>
> -compensating foster parents at the special or exceptional rate,
>
> -additional placement of siblings of a foster child.

p. the City, not the foster care agencies, has the authority to commence and maintain child

protective proceedings, which remove children from their families, place the children in

government custody, and determine the conditions of that custody, *see* N.Y. Fam. Ct Act

§1032(a); indeed, all foster care placements in New York State are made by court order, under

New York Family Court Act Arts. 3, 7, and 10, and under N.Y. Soc. Serv. L. §358-a(3)(a);

q. the City, not the foster care agencies, also has the authority to accept a child into City

foster care as a voluntarily placed child, (N.Y. Soc. Serv. L. §384-a) which then must be

approved by the Family Court, under N.Y. Soc. Serv. L. §358-a(3)(a);

r. when a child comes into foster care, the City may decide whether to establish direct

7

care for that foster child in its public agency, or to select a foster care agency, such as Defendants SVS, to care for the child;

s. when the City chooses a foster care agency to provide care for a foster child, the foster care agency cannot reject the child, as long as the agency has a foster home available to care for the child;

t. when the City chooses a foster care agency to provide care for a child, the child cannot reject the foster care agency and insist upon being cared for by a public agency;

u. New York law provides detailed rules and regulations for the not-for-profit foster care agencies to follow in caring for foster children;

v. the City provides additional detailed rules for the not-for-profit foster care agencies to follow in care for foster children;

w. in caring for foster children, foster care agency staff and administrators work closely with City staff and administrators, on a day-to-day basis;

x. in caring for foster children, foster care agencies use the City's tools and would emulate exactly what the City does;

y. City standards for licensing foster care agency foster homes are comprehensive;

z. the rules require a foster care agency to assign a caseworker for each foster child, who is responsible for overseeing all aspects of the care of the foster child;

aa. in order to ensure proper supervision of the foster children, the City and the State of New York establish maximum caseloads for foster care agency caseworkers;

bb. the City also assigns a City caseworker to each foster child, including each foster child who is in the care of one of the foster care agencies;

8

cc. foster care agency staff are required to document all of their activities regarding each foster child on their caseload in a computer system maintained by the State of New York, known as "Connections," including all visits with the child in the foster home or the foster care agency office, all telephone calls with the child, all visits to the foster parents, all visits with the birth parents, all visits to the child's schools, all other visits and personal contacts concerning the child, all telephone calls with or about the child, all records concerning medical treatment and education for the child, and all other significant information about the child.

dd. the City caseworker assigned to the foster child has access to and reads all entries in "Connections" which have been made by the agency casework staff;

ee. the City caseworker has the right to seek clarification of all entries which raise any questions about the welfare of the foster child;

ff. the City caseworker has the right to insist that the agency caseworker investigate any concerns that the City caseworker raises about the foster child;

gg. every six months, there must be a meeting regarding each foster child, known as a Family Assessment and Service Plan review, to which the City caseworker, the foster agency caseworker, the foster parents, the birth parents, and the child (if over a certain age) must be invited to participate;

hh. the topics to be discussed at the Family Assessment and Service Plan review include the safety of the foster child and the plans for the future of the foster child;

ii. all foster children must have their cases reviewed every six months in a permanency hearing in the Family Court, N.Y. Fam. Ct. Act §1089; even where the foster child is in the care of a foster care agency; the petition for such hearing must be verified by the City or the foster

care agency, served by the local social services district, and must be served upon "the agency supervising the care of the child on behalf of the social services district with whom the child was placed," N.Y. Fam. Ct. Act §1089(b)(1);

jj. foster care agency staff are required to report to the government when they have reason to believe that a foster child has been abused, neglected, or endangered;

kk. foster care agency staff are prohibited from investigating the reports, and must defer to the City to investigate the reports;

ll. the City not only has the power to investigate reports of suspected abuse, neglect, or endangerment of its foster children, it also has the power to craft Corrective Action Plans for the foster children and compel the foster care agency to comply with those Corrective Action Plans;

mm. as part of a Corrective Action Plan, the City has the power to order a foster care agency to move a foster child from one foster home to another;

nn. a foster care agency has the power to move a child from one foster home to another, but, if the foster parent objects, the City has the power to overrule the agency and order the agency not to move the child, 18 N.Y.C.R.R. §443.5;

oo. the City provides a written evaluation of the performance of each foster care agency on an annual basis, known as a Scorecard, which gives letter grades (A through F) to the foster care agency on various aspects of the foster care agency's performance, including protecting foster children from abuse;

pp. for every case of confirmed abuse, neglect, or endangerment of a foster care, a foster care agency must submit to the City a written discussion of the case and an explanation of the actions that the agency took in response to the incident of confirmed abuse; and for every

explanation, the City must decide whether the foster care agency's response to the confirmed abuse, neglect, or endangerment was prudent;

qq. the City's decision regarding the prudence of the agency's response impacts whether the City will renew its contract with the foster care agency;

rr. the City has the power to place an entire foster care agency under "heightened monitoring," which entails more careful oversight by the City's Agency Program Accountability division over the activities of the foster care agency;

ss. if the Family Court terminates the parental rights of the parent of a foster child, as happened in Plaintiffs' case, the court will name the City and the foster care agency as joint legal guardians of the foster child;

tt. agency staff must report to the City each time a foster child suffers an accident, illness, or death; the City has a right to investigate each of those reports;

uu. the City has the right to move a foster child from the care of one of the foster care agencies to the care of another agency, and the foster care agency has no right to challenge the removal;

vv.  although the foster care agencies recruit and select foster parents, employees of Defendant City have the authority to review the case files of the foster parents selected by the foster care agencies, which files include: information concerning the foster parents' income, assets, expenses, jobs, and licenses; medical evaluations of the foster parents; letters of recommendation for the foster parents; information concerning all adults who reside in the foster home; criminal background checks of the foster parents; State Central Register background checks of the foster parents, and other personal information;

ww. employees of the City of New York have the authority to visit foster homes and question foster parents about the foster children;

xx. the City of New York and the foster care agencies share the responsibility for training foster care agency employees.

17.     Upon information and belief, at times relevant, defendant Elissa Grossinger was employed by Defendants SVS as an assistant director. Defendant Grossinger is sued in her individual and official capacities.

18.      Upon information and belief, at all times relevant, Defendant Sandra Rosenthal was employed as a supervisor by Defendants SVS.  Defendant Rosenthal is sued in her individual and official capacities.

19.     Upon information and belief, Defendant Nikisha Steele, at all times relevant, was employed as a case manager by Defendants SVS.

20.     Upon information and belief, Defendant John Olufemi, at all times relevant, was employed as a supervisor by Defendants SVS.

21.     Upon information and belief, Defendant Robert M. Harris was president and chief executive officer of defendant St. Vincent's Services, Inc. from 2008 until 2014.

22.     As president, Defendant Harris was ultimately responsible for the hiring, supervising, and training of casework staff. Defendant Harris was responsible for all practices and policies pertaining to the health and safety of the agency's foster children, including the reporting of abuse of foster children to outside agencies for independent investigation, and the annual re-evaluations of foster parents. Defendant Harris is sued in his official and individual capacities and incurs liability as a state actor and policy maker.

12

23. Upon information and belief, Defendant Tracy Wellman was employed by defendant City of New York as a child protective supervisor. Upon information and belief, defendant Tracy Wellman is presently employed by defendant City of New York.

24. Upon information and belief, Defendant Toni Taylor was employed by defendant City of New York as a child protective specialist in 2008 and 2009. Upon information and belief, defendant Toni Taylor is presently employed by defendant City of New York.

25. Upon information and belief, Defendant Louis Murray was employed by defendant City of New York as a child protective specialist in 2008 and 2009. Upon information and belief, defendant Murray is presently employed by defendant City of New York.

26. Upon information and belief, Defendant Carmen Smith, at all times relevant, was employed as a child protective supervisor by Defendant City of New York. At all times relevant, Defendant Smith was assigned by Defendant City of New York to work in the Office of Special Investigations of the New York City Administration for Children's Services.

27. Upon information and belief, Defendant Deborah Johnston, at all times relevant, was employed by the Defendant City of New York. At all times relevant, Defendant Johnston was assigned by Defendant City of New York to work as a manager in the Office of Special Investigations of the New York City Administration for Children's Services. . Defendant Johnston is sued in her individual and official capacities.

28. Upon information and belief, Defendant Jill Campbell, at all times relevant, was employed as a caseworker by Defendant City of New York. At all times relevant, Defendant Campbell was assigned by Defendant City of New York to work in the Administration for Children's Services.

13

29.     Defendant John Mattingly was the former Commissioner of Defendant City's Administration of Children's Services ("ACS"), which is responsible for the delivery of foster care services to foster children. As Commissioner, Defendant Mattingly was responsible for the direct oversight and supervision of the services provided by the other Defendants. . Defendant Mattingly is sued in his individual and official capacities.

## IV. STATEMENT OF FACTS

30.     Plaintiffs resided with their parents and siblings in Bronx, New York, until 2005.

31.      On or about December 11, 2006, Defendant City removed Plaintiffs from their parents involuntarily, and obtained court orders from the Family Court of the State of New York, placing Plaintiffs in foster care in the custody of Defendant City of New York.

32.     In 2006, Defendant City of New York placed Plaintiffs in the care of Defendant St. Vincent's Services, Inc.

33.     From December, 2006, until October, 2008, Plaintiffs lived with their siblings in a foster home licensed by Defendant St. Vincent's Services, Inc.

34.     In October 2008, Defendant St. Vincent's Services, Inc., with the knowledge and consent of Defendant City, moved Plaintiffs and their sister, but not Plaintiffs' brother, to the foster home of Jovonne Gorham at 316 Hancock Street, Brooklyn, NY.

35.     In October, 2008, Defendants knew or should have known that Jovonne Gorham's home was a dangerous environment for Plaintiffs.

36.     Upon information and belief, Defendants St. Vincent's Services, Harris, Grossinger, Steele, Olufemi, and Rosenthal improperly certified and annually recertified Jovonne

14

Gorham as a foster parent and her home as a foster home.

37.    In certifying and recertifying Jovonne Gorham's foster home, said Defendants and their agents and employees failed to properly investigate Jovonne Gorham and failed to properly determine Gorham's identity, her financial stability, and her ability to care for children without abusing or neglecting them.

38.    Had Defendants performed their professional responsibilities and verified Jovonne Gorham's background information, they would have easily ascertained that she was not planning to house the children in the foster home certified by Defendant St. Vincent's Services, Inc., at 316 Hancock Street, Brooklyn, NY, but Defendants failed to perform their duties.

39.    Jovonne Gorham told Defendant St. Vincent's Services, Inc., falsely, that she owned the house at 316 Hancock Street, Brooklyn, NY. Property ownership records, which are publicly available on the internet, would have showed that Jovonne Gorham had transferred the house to an unrelated third party before applying to become a foster parent.

40.    Upon information and belief, defendants failed to verify the ownership of the house and other material elements of Jovonne Graham's application.

41.    Defendants had a duty to verify all material elements of Jovonne Graham's initial application to be a foster parent and each annual application for recertification.

42.    Falsehoods on an application create serious questions of unfitness. Lack of economic resources, lies, or deceit set up a serious risk of harm for children placed in a home that is sustained by deceit.

43.    As a result, Defendants placed Plaintiffs in an environment that was dangerous to Plaintiffs' health and safety.

15

44.    Upon information and belief, during 2008 and/or 2009, Defendants Taylor and Murray were assigned by Defendant City of New York as caseworkers on Plaintiffs' case.

45.    Upon information and belief, Defendants Taylor and Murray knew or should have known that Jovonne Gorham was unfit to care for Plaintiffs and that Gorham's home was an inadequate foster home.

46.    Upon information and belief, Defendants Taylor and Murray allowed Plaintiffs to remain in Jovonne Gorham's home and failed to protect Plaintiffs from Gorham.

47.    Upon information and belief, during 2008 and/or 2009, Defendant Wellman was assigned by Defendant City of New York as a supervisor on Plaintiffs' case.

48.    Upon information and belief, Defendant Wellman knew or should have known that Jovonne Gorham was unfit to care for Plaintiffs and that Gorham's home was an inadequate foster home.

49.    Upon information and belief, Defendant Wellman allowed Plaintiffs to remain in Jovonne Gorham's home and failed to protect Plaintiffs from Jovonne Gorham.

50.    In placing and retaining Plaintiffs in a dangerous environment, Defendants placed Plaintiffs in danger, which was a substantial factor in causing the violation of Plaintiffs' constitutional right to be protected from harm.

51.    Had Defendants investigated Jovonne Gorham properly, Defendants would have learned that Gorham planned to house her foster children not at her own home, as she had reported, but at her parents' home, which was not a licensed foster home. Neither of Gorham's parents had been screened, investigated, or licensed as foster parents.

52.    Defendants knew or should have known that Plaintiffs did not reside in

Gorham's home because they knew that Plaintiffs did not attend the local school, a short walk from Gorham's home, but instead attended a school which was located near to Gorham's parents' apartment in Red Hook, Brooklyn, an hour away from Gorham's home.

53.    Defendants had a duty to oversee Plaintiffs' education and ensure that Plaintiffs were properly educated.

54.    Upon information and belief, in violation of said duty, Defendants failed to make any inquiry whatsoever about Plaintiffs' education, and consequently failed to learn that Plaintiffs were not attending the school that was located near to Plaintiffs' purported foster home but, instead, attended a school which was an hour away from the purported foster home.

55.    The apartment of Gorham's parents was overcrowded. Plaintiffs and their sister had to sleep on the living room floor, on air mattresses, contrary to foster care regulations.

56.    Gorham's father slept in the room with the girls. In the fall of 2008, Gorham's father began molesting Plaintiffs vaginally, anally, and orally in the Red Hook apartment. In addition, Gorham's father subjected Plaintiffs to other forms of sexual and physical abuse. The abuse continued for many months.

57.    Employees of Defendant St. Vincent's Services, Inc. and Defendant City had actual notice of the fact that Plaintiffs had been wrongfully and surreptitiously moved out of their certified foster home into a different, uncertified home.

58.    Defendants knew or should have known that plaintiffs were being sexually abused.

59.    None of the Defendants took any action to stop the abuse or to protect Plaintiffs from repeated abuse.

60.    Defendants, who had the duty to supervise the care of Plaintiffs, ignored repeated warnings and signs of abuse.

61.    During the time that Plaintiffs were assigned to live in the Gorham home, Defendants never made unannounced visits to Gorham. Instead, Defendants and their employees, including Defendants Rosenthal, Grossinger, Steele, and Olufemi, always gave Gorham advance notice of the visits, enabling Gorham to retrieve Plaintiffs and her siblings from the home of Gorham's parents and maintain the fiction that Plaintiffs lived in Gorham's home.

62.    Upon information and belief, Gorham regularly canceled planned visits by staff of defendants when she was unable to retrieve Plaintiffs from the home of her parents, and Defendants allowed the repeated cancellations without making any inquiry.

63.    Defendants' failure to supervise Plaintiffs while Plaintiffs were purportedly residing in the Gorham home allowed the sexual assaults on Plaintiffs to continue.

64.    Upon information and belief, during the period when Plaintiffs were being sexually abused, Defendants SVS and City of New York lacked policies and procedures to record or otherwise preserve the statements of child victims of abuse.

65.    Upon information and belief, during the period when Plaintiffs were being sexually abused, Defendants SVS and City of New York had constitutionally inadequate policies, practices, and procedures for investigating abuse of foster children and for protecting foster children from abuse.

66.    Case workers, social workers, and supervisors of Defendants City and SVS are mandated to meet frequently with foster children on their caseloads and develop a relationship of trust with them.

18

67.     Defendants Steele, Olufemi, Grossinger, and Rosenthal failed to develop a relationship of trust with Plaintiffs or any other children in the foster home.

68.     Defendants Steele, Olufemi, Grossinger, and Rosenthal failed to meet regularly with Plaintiffs or any other children in the Gorham foster home.

69.     Because of the acts and omissions of the Defendants, no one made an independent or proper investigation of Plaintiffs' complaints of being victimized in foster care and sexually abused in the foster home.

70.     In May 2009, Anthony Jose Diaz, the husband of Jovonne Gorham, was released from prison after serving a sentence of 14 years for homicide and moved in with Jovonne Gorham.

71.     In July 2009, Gorham retrieved Plaintiffs and their sisters from Gorham's parents' apartment in Red Hook and brought them back to the Hancock Street house, to reside with her and Diaz.

72.     Foster care agencies and their employees have a duty to investigate and obtain information on any changes in marital status of the foster parents or new members of the foster parent's household.

73.     Defendants SVS, Steele, Olufemi, Grossinger and Rosenthal failed to supervise the Gorham foster home, failed to conduct face-to-face interviews in the home, failed to make unannounced visits, failed to ascertain the identity of the adults in the Gorham household, and were consequently deliberately indifferent to the fact that a convicted killer had returned to reside in the Gorham foster home.

74.     Upon information and belief, Gorham knew that foster parents who care

19

for children with special medical needs receive higher monthly payments than those who care for children who do not have special needs.

75.     Although neither Plaintiff had special medical needs, Gorham claimed, falsely, that plaintiffs CCB and RB suffered from a serious mental illness.

76.     Upon information and belief, Gorham told a psychiatrist, falsely, that CCB and RB had exhibited symptoms of a serious mental illness.

77.     Upon information and belief, Gorham's false statements convinced the psychiatrist that plaintiffs CCB and RB suffered from a serious mental illness, and the psychiatrist accordingly misdiagnosed plaintiffs CCB and RB and prescribed strong psychotropic medication for plaintiffs, which was medically unnecessary.

78.     Upon information and belief, based upon the misdiagnosis which she had concocted, Gorham persuaded defendants City and SVS to compensate her at the enhanced monthly rate for caring for plaintiff CCB.

79.     On May 9, 2011, Defendants SVS and City of New York obtained a conditional surrender of parental rights from Plaintiffs' father, thereby depriving Plaintiffs of a parent who could protect them.

80.     On August 10, 2011, Defendants SVS and City of New York obtained an order from the Family Court terminating the parental rights of Plaintiffs' mother, thereby depriving Plaintiffs of their other parent.

81.     As a result, Defendants SVS and City of New York were awarded the custody and guardianship of Plaintiffs, and Plaintiffs became completely dependent upon Defendants City and St. Vincent's for all of their care and protection.

82.    Upon information and belief, at times material, Defendant Smith was assigned by Defendant City of New York as a supervisor on Plaintiffs' case, and defendant Johnston was assigned as a manager on Plaintiffs' case.

83.    Upon information and belief, Defendants Taylor, Murray, Smith, and Johnston knew or should have known that Jovonne Gorham was unfit to care for Plaintiffs and that Gorham's home was an inadequate foster home.

84.    Upon information and belief, Defendants Taylor, Murray, Smith, and Johnston allowed Plaintiffs to remain in Jovonne Gorham's home and failed to protect Plaintiffs from Jovonne Gorham.

85.    Upon information and belief, Defendant City belatedly closed the Gorham foster home and revoked Gorham's foster care license in 2011.

86.    Despite having revoked Jovonne Gorham's foster care license, Defendants City and SVS returned Plaintiffs to Gorham's home in 2012.

87.    In December 2012, Defendants SVS and City ceded their joint guardianship of Plaintiffs to Jovonne Gorham, allowing Gorham to become the legal guardian of Plaintiffs.

88.     When Jovonne Gorham obtained guardianship of Plaintiffs, all Defendants ceased supervising Plaintiffs and abandoned Plaintiffs to Jovonne Gorham.

89.    In 2013, Gorham moved with Plaintiffs to the Red Hook, Brooklyn, apartment of  Gorham's parents, the same home in which Joseph Gorham had repeatedly sexually abused Plaintiffs. The two bedroom apartment was already overcrowded; a total of 12 people lived there from the second half of 2013 into 2014.  Jovonne Gorham failed to provide

21

basic necessities for Plaintiffs.

90.     Plaintiffs relived the horrors they had experienced previously, living with the perpetrator who abused them.

91.     Jovonne Gorham continued to emotionally abuse and torment Plaintiffs.

92.      Between July 2013 and September 2014, the conditions in the Gorham home became worse.  During this time, Plaintiffs were entitled to basic support from Defendants, but Defendants failed to provide that support.

93.      In October 2014, Jovonne Gorham began repeatedly trying to evict the then-teenaged Plaintiffs from the overcrowded apartment.

94.     Upon information and belief, the police made a report to the State Central Register of Child Abuse and Maltreatment, stating that Jovonne Gorham had abused or maltreated Plaintiffs.

95.     Upon information and belief, Defendant Mattingly assigned Defendant Campbell to investigate the report and to take action to protect Plaintiffs from continued abuse and maltreatment.

96.     Upon information and belief, Defendant Campbell immediately learned that the report was true, i.e., that Jovonne Gorham had thrown Plaintiffs out of her home, and failed to provide Plaintiffs with food, shelter, clothing, education, or any other basic necessities of life, leaving Plaintiffs alone and abandoned.

97.     Upon information and belief, Defendant Campbell immediately learned that Jovonne Gorham's foster home had been closed and that Jovonne Gorham's foster care license or certification had been revoked in 2011 because Jovonne Gorham had abused and

22

maltreated Plaintiffs at that time.

98.    Despite learning said facts, Defendant Campbell failed to take action to protect Plaintiffs from continued abuse and maltreatment by Gorham. Rather, in October, 2014, Defendant Campbell placed Plaintiffs back in the home of Jovonne Gorham, who continued to abuse and maltreat Plaintiffs.

99.    Said abuse and maltreatment continued for several months, until Plaintiffs ran away from Jovonne Gorham. Even then, Plaintiffs continued to be deprived of an education because Defendant Campbell refused to complete the necessary paperwork.

100.    During the relevant time period, Defendant City's child welfare system was a maze of dysfunctional bureaucracy operating under unconstitutional policies and practices that demonstrated its deliberate disregard for the safety and well-being of the foster children.

101.    As a result of the City's grossly unconstitutional system, Defendants SVS operated in reckless disregard and deliberate indifference of Plaintiffs' safety and well-being, knowing that the City's own unconstitutional policies and practices prevented it from supervising the agencies, and more importantly, the children in City custody.

102.    The City delegated to the foster care agencies licensing, inspections, certifications, home studies, case planning, foster care placement, coordinating family and sibling visits, obtaining and providing services such as health care, education, and permanency planning.

103.    Cases were processed in an assembly-line fashion, with different parts of a child's case handled by separate units, both within the City and Defendants SVS.

104.    The only connection between Defendant City and the children in its legal custody was the flow of paperwork between City caseworkers and those of the voluntary

agencies.  The City's supervision of consisted of nothing more than reviewing paperwork with no method for verifying the accuracy or completeness of the information provided. These policies fostered the blatantly superficial execution of child welfare duties.

105.    In some cases, these policies also resulted in fraudulent acts by caseworkers who lied about making visits, or fabricated entries in case records in order to complete paperwork.

106.    The ease with which Jovonne Gorham was able to take advantage of the City's foster care system illustrates the unconstitutional policies and practices that served as the impetus for various federal class-action lawsuits and other large lawsuits.

107.    Defendants City and SVS placed children in an ad hoc fashion, without regard to the children's specific needs or whether the foster parents had been appropriately screened and/or trained.  Because of a lack of sufficient placements for children like Plaintiffs, children were often placed inappropriately without regard for their safety or well-being.

108.    Defendants City and SVS had massive turnover rates of casework staff, which disrupted the continuity of care of foster children; missing and incomplete case files made it extraordinarily difficult for new caseworkers to familiarize themselves with the children on their caseloads and for existing caseworkers to adequately assess and monitor the children's care. Children who came into care with physical or psychological conditions further deteriorated in Defendants' custody because of inadequately trained caseworkers and foster parents, failure to make required visits, deliberate ignorance of abuse and neglect in foster homes, and failure to ensure provision of appropriate medical and other services.

109.    Defendants knew that New York City's foster care system was dangerous

for foster children, in that:

a. In 1988, the City's Human Resource Administration reported that legally mandated foster home visits only occurred in less than half of the cases, and that barely half of the caseworkers and case managers were formally trained;

b. In 1989, the City Comptroller reported that ACS fraudulently altered dates and backdated forms in 22 percent of cases in order to fabricate compliance with case planning requirements;

c. In 1993, a report of the Center for the Study of Social Policy in Washington, D.C., concluded that communication and transfer of information between ACS and the foster care agencies was "cumbersome and frequently never completed;" that critical information about children in foster care was often difficult or impossible to find, due to incomplete and disorganized case files; that the entire system suffered from staffing, training, and supervision problems; and that ACS's computer system did not support good social work practice;

d. In 1993, the Mayor's Commission for the Foster Care of Children reported that foster care caseloads were unacceptably high and unmanageable, endangering foster children;

e. In 1994, the New York State Comptroller found that ACS failed to properly monitor and supervise the care provided to children by foster care agencies and failed to ensure that the services provided by those agencies were sufficient to meet children's needs; and

f. In 2002, a study by the United States Department of Health and Human Services found that the rate of abuse of foster children in the State of New York (69.7 percent of whom were New York City foster children) was double the national standard; and

g. In 2009, a study by the United States Department of Health and Human Services

revealed that the abuse of foster children in the State of New York remained unchanged, compared to 2002; and

h.  In July 2007, after learning of the case of Judith Leekin, a New York City foster mother who had defrauded the New York City foster care system in order to obtain compensation at high rates while torturing her 12 foster children, Defendant Mattingly sought suggestions to improve evaluations and oversight of foster parents who were receiving higher rates of compensation, in order to reduce the risk that the foster parents were motivated solely by money and were denying necessary services to their foster children;

i. On or about July 21, 2007, advisor Edward Gavin responded to Defendant Mattingly, recommending changes to prevent harm to foster children whose foster parents were receiving enhanced compensation, including: 1) appointing an Integrity Control Director to oversee subsidies paid through the client payment system; 2) making periodic checks on all foster parents who received foster care stipends of more than $3,000.00 per month, to ensure that the foster parents were properly utilizing the funds; and 3) paying special attention to children whose foster parents were receiving compensation at the special and exceptional rates.

110.    Defendant Mattingly was aware of the systemic failures throughout the applicable time period.

111.    Notwithstanding the knowledge of Defendants City and SVS of the systemic failures, said Defendants failed to take action to determine if children had been placed in unsafe foster care placements, like Plaintiffs'.

112.    Defendants' repeated failures to perform their duties and their pervasive pattern and practice of omissions reveals deliberate indifference to the specific duties imposed

upon them for the purpose of safeguarding Plaintiffs from abuse.

113.    Upon information and belief, Defendants Olufemi and Steele, and other employees of Defendants City and SVS, who were responsible for the safety and well-being of children in the City's custody, either failed to identify or deliberately ignored evidence that Jovonne Gorham was acting fraudulently and that Plaintiffs were being abused and neglected while in foster care.

114.    Defendants' caseworkers ignored the most basic of warning signs and red flags when visiting Plaintiffs and the Gorham foster home.

115.    Defendants' caseworkers conducted constitutionally inadequate investigations and assessments of plaintiffs' safety.

116.    Had Defendants performed their professional responsibilities and attempted to verify the information, they would have easily ascertained that Jovonne Gorham and her father were abusing Plaintiffs and her sisters.

117.    Defendants also failed to make appropriate contacts with neighbors, employers, and community members to verify the information Jovonne Gorham provided and make a determination of her character and capacity to foster and adopt children.

118.    Had Defendants made appropriate contacts with neighbors, employers, and community members to verify the information Jovonne Gorham provided and make a determination of her character and capacity to foster and adopt children, they would have easily ascertained that Jovonne Gorham was abusing Plaintiffs.

119.    Pursuant to N.Y. Gen. Mun. L. §50-e(8), plaintiffs are not required to file a notice of claim against the City of New York.

## V. CAUSES OF ACTION

## FIRST CLAIM: UNCONSTITUTIONAL FAILURE TO PROTECT PLAINTIFFS

120.    Paragraphs 1 through 119 are realleged and incorporated by reference.

121.    Plaintiffs had a Constitutional right to be free of unjustified intrusions on their personal security, including physical, sexual, and psychological abuse, while dependent upon government custody in foster care.

122.    As caseworkers and supervisors assigned to Plaintiffs' case, Defendants Steele, Olufemi, Rosenthal, Smith, Johnston, Wellman, Taylor, Murray, and Campbell had an affirmative obligation to protect Plaintiffs from physical, sexual, emotional, and medical abuse and maltreatment while Plaintiffs were in foster care.

123.    Defendants Steele, Olufemi, Rosenthal, Smith, Johnston, Wellman, Taylor, Murray, and Campbell, in gross and wanton disregard of said obligation, and with deliberate indifference to Plaintiffs' health and safety, failed to protect Plaintiffs from physical, sexual, emotional, and medical abuse and maltreatment while Plaintiffs were in foster care. .

124.    Defendants' actions and or omissions deprived Plaintiffs of their rights, privileges, and immunities secured by the Constitution and laws of the United States.

125.    Defendants City and Mattingly improperly authorized defendants SVS to license or certify foster homes without adequate supervision or training.

126.    Defendants SVS, City, Olufemi, Steele, Grossinger, and Rosenthal placed Plaintiffs in a series of dangerous environments in improper foster homes;

127.    Defendants SVS, City, Olufemi, Steele, Grossinger and Rosenthal failed to protect Plaintiffs from abuse and neglect while they were in foster care.

28

128.    By improperly investigating Jovonne Gorham and improperly licensing or certifying Gorham's foster home, placing Plaintiffs in the abusive foster home, detaining Plaintiffs in the Gorham home, failing to remove Plaintiffs from the Gorham home, returning Plaintiffs to the Gorham home, failing to adequately supervise Plaintiffs in the Gorham home, and failing to protect Plaintiffs from sexual abuse, physical abuse, medical abuse, and emotional abuse, all Defendants were deliberately indifferent to Plaintiffs' health and safety and were deliberately indifferent to a serious and imminent risk of harm to Plaintiffs, and abused their power as foster care officials and employees.

129.    Because of the aforesaid violations of law and violations of Plaintiffs' civil rights and common law rights by the Defendants, Plaintiffs suffered injuries including: sexual abuse, serious physical injury, assault, battery, extreme psychological injuries, mental anguish, terror, severe pain, suffering, anxiety, fear, depression, sleeplessness, nightmares, shock, disruption of normal childhood development, incapacitation from pursuing normal education, great emotional pain and suffering, and incurred medical and therapy expenses.

130.    Plaintiffs continue to suffer severe pain, numbness, reduced strength, pain and suffering. Plaintiffs require continuing and future medical treatment, which will continue into the foreseeable future.

**SECOND  CLAIM: UNCONSTITUTIONAL POLICIES AND PRACTICES**

131.    Paragraphs 1 through 130 are re-alleged and incorporated by reference.

132.    Defendants City, Mattingly, SVS, Harris, and Grossinger knew or should have known the facts set forth in paragraphs 1 through 130.

133.     Defendants City and Mattingly knew or should have known that there

was a serious problem of abuse of foster children in the City of New York.

134.    Defendants City and Mattingly knew or should have known that Defendants SVS had a practice of failing to properly train and supervise their employees and staff and failed to protect foster children in their care from harm.

135.    Defendants City and Mattingly (a) maintained a policy of deliberate indifference to the type of care that children received in foster homes; and (b) failed to develop or implement programs to ensure that foster care employees provided proper supervision for foster children; and (c) failed to develop or promulgate guidelines and procedures for the selection and supervision of foster parents; and (d) failed to require their investigators to properly gather evidence to check outside sources instead of relying on the foster agency's assessment, which is more likely to cover up their own problems; and (e) failed to require the searching of outside sources from other family members, schools, neighbors, probation departments, etc., to obtain a diverse array of information from which the investigation can be conducted; and (f) failed to record children's statements with video or audio tapes so that the judgments of the investigators are preserved for outside external review and assessment; and (g) failed to promulgate policies to implement proper initial background checks for foster parents; and (h) failed to provide proper protocols and follow-up for annual recertifications of foster parents; and (i) in the face of known dangers of the risks to children in foster care, failed to develop proper standards; and (j) in the face of known dangers that foster parents who request the higher "special" and "exceptional" rates of compensation are motivated more for financial gain than for the care and well-being of the children, failed to develop proper safeguards and standards; and (k) failed to develop proper policies for investigating foster parent applicants and conducting annual recertifications of foster

parents so that foster care employees properly follow up on income, assets, expenses and the requirement of insisting on proper documentation.

136.    Defendants City and Mattingly knew or should have known that said failures to act would lead to violations of the constitutional rights of children in foster care, and the violations of Plaintiffs' rights and the harms described above.

137.    Defendants City, Mattingly, SVS, Harris, and Grossing knew or should have known that there was a serious problem with child abuse in both the foster care system as a whole and with Defendants SVS in particular.

138.    Defendants City, Mattingly, SVS, Harris, and Grossinger were policy-makers who had a duty to make policy when they knew to a "moral certainty" that their employees would confront a given situation;

139.    Defendants City, Mattingly, SVS, Harris, and Grossinger knew that the situations described above would present their employees with difficult choices of the sort that training or supervision would make less difficult; and that making the wrong choice would frequently cause the deprivation of a citizen's constitutional rights.

140.     The failure of the aforesaid policy-makers to make policy and to provide training and supervision with respect to the difficult choices caused harm to Plaintiffs.

141.    Defendants City and Mattingly were aware of the dangers that higher rates of compensation would give an improper incentive to foster parents.

142.    Defendants City, Mattingly, SVS, Harris, and Grossinger failed to implement procedures to investigate foster parents' claims of income, assets, and expenses.

143.     It was recommended that ACS install a corresponding computer database

at each live scan site and take a digital color photo of every prospective foster parent and create a

case file, with a computer-generated case number, containing the individual's name, address,

marital status, aliases, birthdate, social security numbers, etc.  That database could be cross-

checked with information from other agencies, to verify the information given by the applicants.

144.    City employees assigned to the office of integrity control director should

be trained in the use of various investigative search engines.  The need for this is because people

who have these types of financial discrepancies are more susceptible to corruption or

untrustworthiness; and the concept of trust and truthfulness is essential to the quality of a foster

parent who is safeguarding a child's well being.

145.    Defendants City and SVS wrongfully failed to adopt a policy of

conducting unannounced visits to foster homes. Defendants City and SVS wrongfully failed to

adopt a policy of requiring background checks on adult members of the foster family who

regularly cared for the foster children. By reason of that failure, Jovonne Gorham's father, Joseph

Gorham, never had a background check, even though defendants City and SVS knew that he

regularly cared for the foster children, including plaintiffs.

146.    Despite their awareness of the dangers listed above, Defendants City,

Mattingly, SVS, Harris, and Grossing were deliberately indifferent to the risks of which they

knew or should have known, and took no action to implement action plans or policies that could

remedy and safeguard the situation.

147.    The unconstitutional polices and practices of Defendants City, Mattingly,

SVS, Harris, and Grossinger include the following:

a. failure to follow through with proper identification at the initial foster care application

in the Gorham home and improperly approving that home;

b.  failing to establish proper policies or protocols governing the conduct of the foster care staff, specifically as they relate to the interviewing of, and interacting with children in foster care who have been sexually traumatized;

c. failing to properly train foster care staff in conducting home-finder foster parent initial certifications and annual recertifications;

d. failing to properly train social workers to conduct sensitive and child-centered investigations of sexual abuse, including, but not limited to: 1. establishing a rapport with the children, 2. building trust with the children, 3. interviewing children in a neutral, child-friendly locations, 4. proper interviewing techniques, 5. understanding the reasons that children fail to disclose sexual abuse, 6. understanding the reasons that sexually-abused children recant sexual abuse, and 7. methods for responding to recantation and failure to disclose.

148.    The foregoing customs, policies, usages, practices, procedures and rules of Defendants City and SVS were deliberately indifferent to the safety, well-being and constitutional rights of foster children, including Plaintiffs.

149.    The foregoing customs, policies, usages, practices, procedures and rules of Defendants City and SVS were the direct and proximate cause of the constitutional violations suffered by Plaintiffs.

150.    The foregoing customs, policies, usages, practices, procedures and rules of Defendants City and SVS were the moving force behind the constitutional violations suffered by Plaintiffs.

151.    The acts complained of were carried out by the aforementioned individual

33

Defendants in their capacities as foster care caseworkers, social workers and officials pursuant to the customs, policies, usages, practices, procedures and rules of Defendants City and SVS.

152.    As a result of the failures of the aforementioned Defendants, Plaintiffs were subjected to assault and sexual abuse and serious physical injury while in foster care, and lack of proper medical care and lack of proper therapy care.

153.    By reason of their acts and omissions, Defendants, acting under color of state law in gross and wanton disregard of Plaintiffs' rights, deprived Plaintiffs of their liberty, privacy, and of their right to be free from unjustified intrusions on their personal security, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

154.    Because of the aforesaid violations of law and violations of Plaintiffs' civil rights and common law rights by the Defendants, Plaintiffs suffered injuries including: sexual abuse, serious physical injury, assault, battery, improper supervision, inadequate guardianship, extreme psychological injuries, mental anguish, terror, severe pain, suffering, anxiety, fear, depression, sleeplessness, nightmares, shock, disruption of normal childhood development, great emotional pain and suffering, and incurred medical and therapy expenses.

155.    Plaintiffs continues to suffer severe pain, numbness, reduced strength, pain and suffering. Plaintiffs requires continuing and future medical treatment, which will continue into the foreseeable future.

### THIRD CLAIM: UNCONSTITUTIONAL TRAINING

156.    Paragraphs 1 through 155 are realleged and incorporated by reference.

157.    Defendants City, Mattingly, SVS, Grossinger, and Harris had an obligation to provide training to foster care workers and supervisors regarding:

34

a. The investigation and licensing of prospective foster parents;

b. The selection of foster homes for particular foster children who have been sexually abused or maltreated;

c. Supervision of children in foster homes;

d. The protection of foster children from other children or adults in the foster home and the proper security, safety and supervision of foster homes.

e. The prevention sexual abuse in foster homes and the identification of sexual abuse so that children who come into foster care having been previously traumatized and sexually abused are safe and secure and are helped instead of harmed while they are placed in foster care.

158.    Defendants City, Mattingly, SVS, Grossinger, and Harris failed in their obligations to provide training to staff in the subjects listed above.

159.    Defendants City, Mattingly, SVS, Grossinger, and Harris knew or should have known that failure to provide training would cause risks to the safety of foster children.

160.    In failing to provide adequate training to social workers and supervisors Defendants City, Mattingly, SVS, Grossinger, and Harris were deliberately indifferent to the welfare of foster children in their custody and to the risk of injury of those children.

161.    As a result of the aforementioned failures of Defendants City, Mattingly, SVS, Harris, and Grossinger, Plaintiffs were subjected to sexual, physical, and emotional abuse.

162.    By reason of their acts and omissions, Defendants City, Mattingly, SVS, Harris, and Grossinger, in gross and wanton disregard of Plaintiffs' rights, deprived Plaintiffs of their liberty, their privacy and their right to be free from unjustified intrusions on their personal security, in violation of the Fourteenth Amendment of the United States Constitution.

163.    Because of the aforesaid violations of law and violations of Plaintiffs' rights by the Defendants, Plaintiffs suffered injuries including: sexual abuse, serious physical injury, assault, battery, improper supervision, inadequate guardianship, extreme psychological injuries, mental anguish, terror, severe pain, suffering, anxiety, fear, depression, sleeplessness, nightmares, shock, disruption of normal childhood development, incapacitation from pursuing their normal school and vocational training and education, great emotional pain and suffering, and incurred medical and therapy expenses.

164.    Plaintiffs continues to suffer severe pain, numbness, reduced strength, pain and suffering. Plaintiffs requires continuing and future medical treatment, which will continue into the foreseeable future.

## FOURTH CLAIM: EXCESSIVE FORCE

165.    Paragraphs 1 through 164 are realleged and incorporated by reference.

166.    In failing to protect Plaintiffs from assault while in foster care, all Defendants acquiesced in the use of excessive force against Plaintiffs, in violation of the Fourth Amendment of the United States Constitution.

167.    Because of the aforesaid violations of Plaintiffs' civil rights and common law rights by the Defendants, Plaintiffs suffered injuries including: sexual abuse, serious physical injury, assault, battery, improper supervision, inadequate guardianship, extreme psychological injuries, mental anguish, terror, severe pain, suffering, anxiety, fear, depression, sleeplessness, nightmares, shock, necessitating medical treatment and medication, disruption of normal childhood development, incapacitation from pursuing normal education, great emotional pain and suffering, and incurred medical and therapy expenses.

168.    Plaintiffs continue to suffer severe pain, numbness, reduced strength, pain and suffering. Plaintiffs require continuing and future medical treatment, which will continue into the foreseeable future.

## FIFTH CLAIM: STATE LAW NEGLIGENCE

169.    Paragraphs 1 through 168 are realleged and incorporated by reference.

170.    Under the law of New York State, all of the Defendants had a non-delegable duty to Plaintiffs to provide safe and secure living arrangements and to protect them from child abuse and child maltreatment.

171.    In failing to protect plaintiffs from abuse, and in failing to provide plaintiffs with appropriate medical treatment, defendants recklessly disregarded their duty to plaintiffs and breached said duty to Plaintiffs

172.    Defendants' actions and omissions were the proximate cause of Plaintiffs' injuries.

173.    Because of the aforesaid violations of Plaintiffs' rights by the Defendants, Plaintiffs suffered injuries including: sexual abuse, serious physical injury, assault, battery, improper supervision, inadequate guardianship, extreme psychological injuries, mental anguish, terror, severe pain, suffering, anxiety, fear, depression, sleeplessness, nightmares, shock, disruption of normal childhood development, incapacitation from pursuing normal education, emotional pain and suffering, and medical and therapy expenses.

174.    Plaintiffs continues to suffer severe pain, numbness, reduced strength, pain and suffering. Plaintiffs requires continuing and future medical treatment, which will continue into the foreseeable future.

37

**SIXTH CLAIM: STATE LAW SPECIAL DUTY**

175.    Paragraphs 1 through 174 are realleged and incorporated by reference.

176.    Because Plaintiffs were children in foster care in the custody of Defendant City and in the care of Defendants SVS, Plaintiffs had a special relationship with Defendants City and SVS.

177.    As a result of the special relationship, all of the Defendants had a special duty to protect Plaintiffs from harm.

178.    Defendants duty to protect plaintiffs was non-delegable.

179.    Defendants failed to exercise special care, or even reasonable care, in discharging their duty to protect Plaintiffs from harm.

180.    Because of the aforesaid violations of Plaintiffs' rights by the Defendants, Plaintiffs suffered injuries including: sexual abuse, serious physical injury, assault, battery, extreme psychological injuries, mental anguish, terror, severe pain, suffering, anxiety, fear, depression, sleeplessness, nightmares, shock, necessitating medical treatment and medication, disruption of normal childhood development, incapacitation from normal education, great emotional pain and suffering, and medical and therapy expenses.

181.    Plaintiffs continue to suffer severe pain, numbness, reduced strength, pain and suffering. Plaintiffs require continuing medical treatment, which will continue into the foreseeable future.

**SEVENTH CLAIM: BREACH OF CONTRACT**

182.    Paragraphs 1 through 181  are realleged and incorporated by reference.

183.    At all times applicable, defendants St. Vincent's Services, Inc., HeartShare

St. Vincent's Services, and HeartShare Human Services of New York were parties to contracts with defendant City, pursuant to which defendant St. Vincent's Services, Inc., HeartShare St. Vincent's Services, and HeartShare Human Services of New York agreed to provide foster care to children who were placed with defendant City.

184.    Pursuant to said contracts, defendant City agreed to compensate defendant St. Vincent's Services, Inc., HeartShare St. Vincent's Services, and HeartShare Human Services of New York.

185.    Pursuant to said contract, defendant St. Vincent's Services, Inc., HeartShare St. Vincent's Services, and HeartShare Human Services of New York were required to provide safe, competent and professional supervision of children in foster care and to protect children in their care from sexual, physical, and emotional abuse.

186.    As foster children  in the care of defendant St. Vincent's Services, Inc., HeartShare St. Vincent's Services, and HeartShare Human Services of New York  plaintiffs were the beneficiaries of the contracts between defendant City and defendants SVS.

187.    While plaintiffs were in foster care with defendants SVS, defendants SVS breached their contracts with defendant City.

188.     Because of the aforesaid violations of Plaintiffs' rights by the Defendants, Plaintiffs suffered injuries including: sexual abuse, serious physical injury, assault, battery, extreme psychological injuries, mental anguish, terror, severe pain, suffering, anxiety, fear, depression, sleeplessness, nightmares, shock, necessitating medical treatment and medication, disruption of normal childhood development, incapacitation from normal education, great emotional pain and suffering, and medical and therapy expenses.

189.    Plaintiffs continue to suffer severe pain, numbness, reduced strength, pain and suffering. Plaintiffs require continuing medical treatment, which will continue into the foreseeable future.

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered jointly and severally against the Defendants:

1. Awarding Plaintiffs compensatory damages in a sum to be decided by the jury;

2. Awarding Plaintiffs punitive damages in a sum to be decided by the jury;

3. Awarding Plaintiffs interest from September, 2008;

4. Awarding Plaintiffs, reasonable attorneys fees pursuant to 42 U.S.C. §1988;

5. Awarding Plaintiffs the costs and disbursements of this action; and

6. Awarding such other and further relief as the Court deems just and proper.

Dated: New York, New York
        August 20, 2020

s/ Bruce A. Young
Bruce A. Young
100 Church Street, Suite 800
New York, New York 10007
(646) 775-8994

s/ Carolyn A. Kubitschek
Carolyn A. Kubitschek
Lansner & Kubitschek
325 Broadway, Suite 203
New York, New York 10007
(212) 349-0900
Ckubitschek@lanskub.com

Attorneys for Plaintiffs